UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

QI XIANG LING,

        Petitioner,

v.

ROY L. HENDRICKS,

        Respondent.

Civ. No. 13-7610 (KM)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.**

## I. INTRODUCTION

Petitioner, Qi Xiang Ling, is currently an immigration detainee who was previously detained at the Essex County Correctional Facility in Newark, New Jersey.[1] Mr. Ling is a citizen of the People's Republic of China. He is proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 seeking his release from immigration detention. For the following reasons, the habeas petition will be dismissed without prejudice.

## II. BACKGROUND

Mr. Ling was ordered removed from the United States in 1993 and again in 1998. He remained in the United States unlawfully. On February 17, 2013, Mr. Ling encountered Bureau

---

[1] The Bureau of Immigration and Customs Enforcement's online detainee locator indicates that Mr. Ling is now detained at the Etowah County Detention Center in Gadsden, Alabama. Accordingly, the Clerk will be ordered to update Mr. Ling's listed address. Although Mr. Ling is no longer detained in this District, this Court retains jurisdiction over this action as Mr. Ling was detained within this District when he filed his habeas petition. *See Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004) ("[W]hen the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release."); *see also Lee v. Zickefoose*, No. 12-130, 2012 WL 5403134, at *2 (D.N.J. Nov. 5, 2012) ("Jurisdiction is determined as of the time the petition is filed.")

1

of Immigration and Customs Enforcement ("ICE") officers who determined he was a fugitive with an outstanding order of exclusion and deportation (albeit under a different name). On March, 19, 2013, Mr. Ling was taken into immigration custody pending his removal.

Thereafter, ICE began the process of attempting to effectuate Mr. Ling's removal from the United States. On March 22, 2013, the deportation officer sent an application for a travel document to the Chinese Consulate. Mr. Ling then completed a Chinese Citizenship Verification Application which was sent to the Chinese Consulate on April 5, 2013.

On May 8, 2013, the deportation officer received an email from Mr. Huang of the Chinese Consulate requesting that Mr. Ling provide information as to where he lived before entering the United States. Mr. Ling told the deportation officer that, before he entered the United States, he last lived in the city of Fuijan. On May 30, 2013, Mr. Huang again requested the name of the village where Mr. Ling lived. Mr. Ling wrote the name of his village in Chinese characters. On June 5, 2013, Mr. Huang stated in an email to the deportation officer that Mr. Ling's identification of the village where he had lived was incorrect.

Thereafter, Mr. Huang interviewed Mr. Ling by telephone on June 11, 2013. Mr. Ling claimed that he did not know the name of the village where he was born. Mr. Huang agreed to speak to Mr. Ling's family to find out more details.

On July 16, 2013, Mr. Ling provided the deportation officer with a telephone number for his family. The number turned out to be invalid. On July 25, 2013, an ICE staff member discussed Mr. Ling's case with the Chinese Consulate. The Chinese Consulate told this staff member that Mr. Ling's birth village needed to be provided before a travel document would be issued. On September 4, 2013, the deportation officer heard from Mr. Huang who stated that Mr. Ling's family never called and that he still did not have Mr. Ling's birth village information.

Mr. Ling completed a second travel document application, which included his birth village, on October 7, 2013. On October 21, 2013, however, the Chinese Consulate advised ICE that Mr. Ling was not telling the truth about his birth village. The Chinese Consulate maintains that the birth village that Mr. Ling has identified is not located where Mr. Ling says it is, and that there is no record of Mr. Ling's birth at that village.

On November 5, 2013, Mr. Ling refused to complete another travel document application and stated that his family would not call the Chinese Consulate. Mr. Ling again refused to complete a travel document application on December 11, 2013. The deportation officer has since sent an email to the Chinese Consulate so that it can interview Mr. Ling again.

On June 15, 2013, ICE's Field Office Director reviewed Mr. Ling's custody status and determined that Mr. Ling would not be released at that time. On September 30, 2013, the Headquarters Post Order Unit of ICE reviewed Mr. Ling's custody status. Again, it was determined that Mr. Ling would not be released at that time. On December 30, 2013, the Field Office Director again reviewed Mr. Ling's detention. He provided Mr. Ling with a Notice of his Failure to Comply, and again determined that Mr. Ling would not be released from custody at that time. ICE explained to Mr. Ling that he failed to assist ICE in its efforts to remove him because he had provided false information to the Chinese Consulate. Thus, ICE informed Mr. Ling that his removal period was being extended and that he would remain in ICE custody until such time as he demonstrated that he was making reasonable efforts to cooperate with ICE's efforts to have him removed.

In December, 2013, this Court received Mr. Ling's federal habeas petition. The petition raises two issues: (1) whether the amount of time Mr. Ling has spent in immigration detention

violates *Zadvydas v. Davis*, 533 U.S. 678 (2001); and (2) whether his constitutional rights have been violated by ICE's failure to personally interview him.

### III. DISCUSSION

The Attorney General has the authority to detain aliens in removal proceedings both before and after the issuance of a final order of removal. Post-removal order immigration detention is governed by 8 U.S.C. § 1231(a). Section 1231(a)(1)(A) states that, "except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period")." *Id.* § 1231(a)(1)(A). The removal period begins on the latest of the following:

> (i) The date the order of removal becomes administratively final.
> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

*Id.* § 1231(a)(1)(B). Federal regulations provide that:

> An order of removal made by the immigration judge at the conclusion of the proceedings under section 240 of the Act shall become final:
>
> (a) Upon dismissal of an appeal by the Board of Immigration Appeals;
> (b) Upon waiver of appeal by the respondent;
> (c) Upon expiration of the time allotted for an appeal if the respondent does not file an appeal within that time;
> (d) If certified to the Board or Attorney General, upon the date of the subsequent decision ordering removal; or
> (e) If an immigration judge issues an alternate order of removal in connection with a grant of voluntary departure, upon overstay of the voluntary departure period, or upon the failure to post a required voluntary department bond within 5 business days. If

> the respondent has filed a timely appeal with the Board, the order shall become final upon an order of removal by the Board or the Attorney General, or upon overstay of the voluntary departure period granted or reinstated by the Board or the Attorney General.

8 C.F.R. § 1241.1(a). Section 1231(a)(2) requires that the alien be detained during the ninety day post-removal order period. *See* 8 U.S.C. § 1231(a)(2). If the alien is not removed during the ninety-day period, then § 1231(a)(6) authorizes that the alien be released on bond or that the alien be continued to be detained:

> An alien ordered removed who is inadmissible under section 1982 of this title, under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

8 U.S.C. § 1231(a)(6).

A. *Zadvydas* Claim

In *Zadvydas*, 533 U.S. 678, the United States Supreme Court stated that § 1231(a)(6) does not authorize the Attorney General to detain aliens indefinitely beyond the removal period, but "limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention." 533 U.S. at 689. The Supreme Court stated that a period of six months is a presumptively reasonable period of post-removal detention under § 1231(a)(6). *See Zadvydas*, 533 U.S. at 701. However, for a petitioner to state a claim under § 2241, the petitioner must provide in the petition facts showing good reason to believe that there is no reasonable likelihood of his actual removal in the reasonably foreseeable future. *See id.* "*Zadvydas* does not delineate the boundaries of evidentiary sufficiency, but it suggests that an inversely proportional relationship is at play: the

5

longer an alien is detained, the less he must put forward to obtain relief." *Alexander v. Attorney Gen. of United States*, 495 F. App'x 274, 276-77 (3d Cir. 2012) (per curiam) (citing *Zadvydas*, 533 U.S. at 701).

Nevertheless, "[t]he removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal." 8 U.S.C. § 1231(a)(C). "*Zadvydas* does not save an alien who fails to provide requested documentation to effectuate his removal. The reason is self-evident: the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock." *Pelich v. INS*, 329 F.3d 1057, 1060 (9th Cir. 2003); *Xiangquan v. Holder*, No. 12-7650, 2013 WL 1750145, at *3 (D.N.J. Apr. 23, 2013) ("[A]n alien who, during his/her presumptive *Zadvydas* based period, takes actions delaying his/her removal (e.g. by refusing to cooperate with the ICE's removal efforts), cannot demand his/her release upon expiration of these six months . . . . Rather, the period affected by the alien's obstructive actions is excluded from the presumptive period articulated in *Zadvydas*, thus causing a quasi-tolling mimicking, in its operation[.]") (internal citations omitted). Accordingly, Courts have found that a petitioner who fails to cooperate with his removal fails to establish that there is no likelihood of removal in the reasonably foreseeable future under *Zadvydas*. *See Conceicao v. Holder*, No. 12-4668, 2013 WL 1121373, at *3 (D.N.J. Mar. 13, 2013) ("[W]here Petitioner is refusing to sign the necessary travel documents, he has failed to cooperate in his removal and has failed, in this Court, to establish that there is no likelihood of his removal in the reasonably foreseeable future."); *Diaz-Martin v. Holder*, No. 11-6692, 2012 WL 4661479, at *4-5 (D.N.J. Oct. 2, 2012) (finding that

where petitioner failed to cooperate in his removal, he failed to establish that there is no likelihood of his removal in the reasonably foreseeable future); *Camara v. Gonzales*, No. 06-1568, 2007 WL 4322949, at *4 (D.N.J. Dec. 6, 2007) (finding that petitioner failed to state a constitutional claim under *Zadvydas* due to his failure to cooperate with INS to obtain the necessary travel documentation).

In this case, Mr. Ling has failed to cooperate with ICE officials to effectuate his removal. Indeed, Mr. Ling has apparently lied to Chinese officials regarding his birthplace as well as his address immediately prior to moving to the United States. Furthermore, Mr. Ling apparently provided an invalid telephone number for his family members. This has apparently made obtaining the necessary travel documents difficult. Additionally, Mr. Ling has refused to sign further travel removal application documents. ICE has instructed Mr. Ling what he needs to do: provide documentation of his true identity and fill out the Chinese Identity Verification Form truthfully. (*See* Dkt. No. 5-4 at p. 14.) Because he has failed to cooperate with removal proceedings, Mr. Ling has failed to show that he is entitled to habeas relief under *Zadvydas*. He cannot shown that there is no likelihood of his removal in the reasonably foreseeable future because it is he himself who stands in the way. *Accord Conceicao*, 2013 WL 1121373, at *3; *Diaz-Martin* 2012 WL 4661479, at *4-5; *Camara*, 2007 WL 4322949, at *4.

This claim is therefore dismissed. Because Mr. Ling may in the future be able to satisfy the *Zadvydas* standard, the dismissal of this claim will be without prejudice.

B. <u>Personal Interview Claim</u>

Mr. Ling also claims that ICE has not provided him with a constitutionally adequate custody review. More specifically, Mr. Ling claims that he was never personally interviewed or given a fair opportunity to show why he should be released from immigration detention.

It is not entirely clear upon what basis Mr. Ling claims he is entitled to a personal interview, or that the failure of United States immigration authorities to conduct a personal interview violates his constitutional rights. Nevertheless, the Court notes that 8 C.F.R. § 241.4 provides regulations for the continued detention of inadmissible, criminal and other aliens beyond the removal period. The regulations state that the initial custody determination shall be made by the District Directors and Directors of Detention and Removal Field Offices in the three month period immediately following the expiration of the ninety-day removal period. *See* 8 C.F.R. § 241.4(c)(1). At that initial review, the District Director has discretion to schedule a personal or telephone interview with the alien as part of the custody determination. *See id.* § 241.4(h)(1). Additionally:

> For any alien the district director refers for further review after the removal period, or any alien who has not been released or removed by the expiration of the three-month period after the review, all further custody determinations will be made by the Executive Associate Commissioner, acting through the [Headquarters Post-Order Detention Unit] HQPDU.

*Id.* § 241.4(c)(2). The regulations further lay out how determinations are made by the Executive Associate Commissioner, they include the following:

> (i) Determinations by the Executive Associate Commissioner. Determinations by the Executive Associate Commission to release or retain custody of aliens shall be developed in accordance with the following procedures:
>
>> (1) Review panels. The HQPDU Director shall designate a panel or panels to make recommendations to the Executive Associate Commissioner. A Review Panel shall, except as otherwise provided, consist of two persons. Members of a Review Panel shall be selected from the professional staff of the Service. All recommendations by the two-member Review Panel shall be unanimous. If the vote of the two-member Review Panel is split, it shall adjourn its deliberations concerning that particular detainee until a third

8

> Review Panel member is added. The third member of any Review Panel shall be the Director of the HQPDU or his or her designee. A recommendation by a three-member Review Panel shall be by majority vote.
> (2) Records Review. Initially, and at the beginning of each subsequent review, the HQPDU Director or a Review Panel shall review the alien's records. Upon completion of this records review, the HQPDU Director or the Review Panel may issue a written recommendation that the alien be released and reasons therefore.
> (3) Personal Interview.
>> (i) If the HQPDU Director does not accept a panel's recommendation to grant release after a records review, or if the alien is not recommended for release, a Review Panel shall personally interview the detainee. The scheduling of such interviews shall be at the discretion of the HQPDU Director. The HQPDU Director will provide a translator f he or she determines that such assistance is appropriate.

*Id.* § 241.4(i).

As these regulations provide, Mr. Ling would potentially be entitled to a personal interview after the ninety-day removal period has ended, but only after the decision to continue to detain him has reached the HQPDU level.

Section 241.4(g)(ii) of the regulations also states that:

> The removal period shall run for a period of 90 days. However, the removal period is extended under section 241(a)(1)(C) of the Act if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal. The Service will provide such an alien with a Notice of Failure to Comply, as provided in paragraph (g)(5) of this section, before the expiration of the removal period. The removal period shall be extended until the alien demonstrates to the Service that he or she has complied with the statutory obligations. One the alien has complied with his or her obligations under the law, the Service shall have a reasonable period of time in order to effect the alien's removal.

9

*Id.* at § 241.4(g)(ii). The regulations also note the need for the alien to be cooperative; specifically:

> (i) Release will be denied and the alien may remain in detention if the alien fails or refuses to make timely application in good faith for travel documents necessary to the alien's departure or conspires or acts to prevent the alien's removal. The detention provisions of section 241(a)(2) of the Act will continue to apply, including provisions that mandate detention of certain criminal and terrorist aliens.
> (ii) The Service shall serve the alien with a Notice of Failure to Comply, which shall advise the alien of the following: the provisions of section 241(a)(1)(C) (extension of removal period) and 243(a) of the Act (criminal penalties related to removal); the circumstances demonstrating his or her failure to comply with the requirements of section 241(a)(1)(C) of the Act; and an explanation of the necessary steps that the alien must take in order to comply with the statutory requirements.
> (iii) The Service shall advise the alien that the Notice of Failure to Comply shall have the effect of extending the removal period as provided by law, if the removal period has not yet expired, and that the Service is not obligated to complete its scheduled custody reviews under this section until the alien has demonstrated compliance with the statutory obligations.

*Id.* § 241.4(g)(5)(i)-(iii).

In accordance with this regulation, ICE provided Mr. Ling with a Notice of Failure to Comply on December 30, 2013, stating that his custody status had been reviewed and that the removal period had been extended because he had failed to cooperate. The removal period is suspended or tolled during Mr. Ling's continued non-compliance. *See Orelhomme v. Napolitano*, No. 11-0496, 2011 WL 3155921, at *1 (W.D. La. June 28, 2011) ("[I]f an alien fails or refuses to cooperate with ICE in obtaining a travel document to effect removal, or takes other actions to prevent his removal, the removal period is suspended or tolled, and his continued

detention is authorized."), *report and recommendation adopted by*, 2011 WL 3155839 (W.D. La. July 26, 2011); *Cuello v. Adduci*, No. 10-13641, 2010 WL 4226688, at *4 n. 4 (E.D. Mich. Oct. 21, 2010) ("Generally, courts have only tolled the removal period in cases where the alien has demonstrated some sort of bad faith failure to cooperate, such as providing authorities with false or inconsistent information regarding identity or country of origin, or refusing to complete travel arrangements or name a country for deportation.") (citations omitted).

Mr. Ling's non-cooperation began, at the latest, on June 5, 2013 (within the ninety-day removal period), when the Chinese Consulate informed deportation authorities that the village Mr. Ling claimed to have lived in prior to his arrival in the United States was incorrect. As noted above, Mr. Ling has continued to be non-cooperative since that time. Additionally, ICE extended the removal period in its December 30, 2013 Notice of Failure to Comply, which put Mr. Ling on notice what he needed to do to be in compliance. Therefore, because the removal period has been extended/tolled due to Mr. Ling's lack of cooperation, he cannot show that any right to a personal interview has been violated.[2] Such a right would arise only at the conclusion

---

[2] I note that ICE did not provide Mr. Ling with a copy of the Notice of Failure to Comply (which acted to extend the removal period) within the ninety-day removal period set forth by the regulations. *See* 8 C.F.R. § 241.4(g)(1)(ii) (stating that a notice of failure to comply will be provided to the alien before the expiration of the ninety-day removal period). However, at least one court has noted that immigration authorities comply with their regulatory requirements and thereby retaining the ability to extend the removal period even after it is expired where a petitioner is not cooperating to effectuate his removal. *See Ramos v. Chertoff*, No. 07-858, 2009 WL 1563894, at *6 (W.D.N.Y. June 2, 2009) (citing 8 C.F.R. § 241.4(g)(5)(iv)). Indeed, the regulations even specifically recognize that a notice of failure to comply may be entered after ninety-days has passed by stating that "[t]he fact that the Service does not provide a Notice of Failure to Comply within the 90-day removal period, to an alien who has failed to comply with the requirements of section 241(a)(1)(C) of the Act, shall not have the effect of excusing the alien's conduct." 8 C.F.R. § 241.4(g)(5)(iv). Additionally, it is worth reiterating in this case that Mr. Ling's non-cooperation began during the initial ninety days, on or about June 5, 2013, when immigration officials found out that the village Mr. Ling had stated to Chinese officials that he lived at prior to his arrival in the United States was incorrect.

of Mr. Ling's removal period (which, as extended, is still in effect) and potential possible review by HQPDU. Accordingly, this claim will also be dismissed without prejudice.

## IV. CONCLUSION

For the foregoing reasons, the habeas petition will be dismissed without prejudice. An appropriate order will be entered.

Dated: March 27, 2014

_____
KEVIN MCNULTY
United States District Judge